# IN THE COURT OF APPEALS OF IOWA

No. 19-2116
Filed September 23, 2020

**IN THE INTEREST OF O.G.,**
**Minor Child,**

**M.J., Mother,**
    Petitioner-Appellee,

**P.G., Father,**
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Des Moines County, Jennifer S. Bailey, District Associate Judge.

A father appeals an order terminating his parental rights pursuant to Iowa Code chapter 600A (2019). **AFFIRMED.**

Ciara Vesey of Law Office of Ciara L. Vesey PLLC, Davenport, for appellant father.

Lucas C. Helling of Foss, Kuiken, Cochran & Helling, P.C., Fairfield, for appellee mother.

Joshua P. Schier of Cray Law Firm, PLC, Burlington, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Tabor and Schumacher, JJ.

**SCHUMACHER, Judge.**

A father appeals the district court's ruling terminating his parental rights to his daughter, O.G., following an action initiated by the child's mother pursuant to Iowa Code chapter 600A (2019). He argues the court erred in finding clear and convincing evidence that he abandoned his daughter within the meaning of Iowa Code section 600A.8(3). He also argues termination is not in O.G.'s best interest and asserts the district court should have appointed O.G. an attorney separate from O.G.'s guardian ad litem.

On our independent review of the record, we affirm the district court's finding that the father abandoned his daughter within the statutory definition contained in Iowa Code chapter 600A and agree termination of his parental rights is in O.G.'s best interest. As his argument concerning his daughter's representation was not raised at the district court level, we find such argument unpreserved and do not address the same. We affirm the district court's order terminating the father's parental rights.

I.      **Factual and Procedural Background**

O.G. is a female child, born in 2011. At the time of the termination hearing, she was eight years old. By all accounts, she is a well-adjusted, talented, and happy child. O.G. has resided with her mother since birth. Other than a short period after the child's birth, her father, P.G., has not resided in the same home as O.G. O.G.'s parents ended their relationship in the summer of 2011, and O.G.'s mother and O.G. established a residence separate from P.G. by June or July 2011, when O.G. was approximately five or six months old.

On June 13, 2011, P.G. was arrested for conspiracy to distribute at least five kilograms of a mixture and substance containing cocaine and possession of a firearm in furtherance of drug trafficking, both federal charges. Convictions were entered for both offenses on May 21, 2012. P.G. was incarcerated from June 2011 to January 2015. Following such incarceration, he served a six-month term of house arrest. During the period of incarceration, P.G.'s contact with O.G. or O.G.'s mother was minimal. He agreed that visitation should not occur at the federal penitentiary. Following release from prison, P.G. made no efforts to contact his daughter or her mother.

After a period of nearly five years with no visitation between P.G. and his daughter, O.G's mother filed a petition to establish custodial rights after she learned P.G. had been released from federal custody.[1] An order followed, placing sole legal custody and physical care with the mother and providing P.G. with the right of visitation one weekend per month. The decree contained provisions regarding supervision and duration for these visits. P.G. was ordered to pay thirty dollars per month child support through the child support recovery unit. P.G. exercised visitation under the decree in April, May, June, and July 2016. Court records reflect that he has never made a child support payment.[2]

---

[1] Prior to the initiation of the custody petition, P.G. last visited with O.G. in June 2011 when O.G. was five months old, just prior to his arrest on federal charges.
[2] Exhibits and testimony offered at trial establish that P.G. provided sums directly to the mother to assist with daycare, the last money order being dated September 2012. He also gave the mother $60.00 cash in May 2016. After the termination petition was filed, O.G.'s paternal grandfather mailed money orders for payment of support; however, when the mother attempted to access the funds, the bank refused to honor the money orders.

After the July visit, P.G. informed O.G.'s mother he was going on a "retreat" and would not be able to exercise visits or have phone contact. O.G.'s mother later learned that P.G. was arrested on a parole violation warrant, issued July 20, 2016. After admitting the violation, he served an additional four months of incarceration, from September to December 2016. P.G. made no contact with his daughter during this latest period of incarceration. While P.G. was incarcerated, O.G.'s mother married in October 2016, and she had a son with her husband in 2017. Following his release in 2016, P.G. made no contact until December 2018, when he emailed O.G's mother, inquiring about O.G.'s shoe size for purposes of purchasing a Christmas gift. O.G.'s mother filed a petition for termination of P.G.'s parental rights in January 2019. P.G. did not request a visit with O.G. until after the termination petition was filed.

Prior to the filing of the district court custody petition by O.G.'s mother, P.G. had no visitation with his daughter from June 2011 until July 2016. At the time of the termination hearing, two and a half years had lapsed from the most recent visit, which occurred in July 2016. As noted by the district court, request for personal contact with O.G. came only upon initiation of court proceedings by O.G.'s mother. Relevant to this appeal are P.G.'s admissions that it was his choice not to be a part of his daughter's life and that he accepted responsibility for being absent.

At the time of the termination hearing, P.G. was unemployed but starting his own business, indicating that his parents and his fiancée supported him.[3] The record is void of any evidence that he is not able to earn an income sufficient to

---

[3] P.G. acknowledged that while he would be promoting music artists he did not currently have any clients.

pay $30.00 per month for his daughter's support. As noted by the district court, P.G. is a charismatic man, eloquent in words and manner of speaking and who "appears to be an able-bodied man in his thirties . . . who did not testify to any disabilities."

## II. Scope of Review

We review termination proceedings de novo. *In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct. App. 1999). "The grounds for termination must be proven by clear and convincing evidence." *Id.* Our primary concern is the child's best interest. *Id.*

## III. Abandonment

The Iowa Supreme Court has stated:

> Termination proceedings under Iowa Code chapter 600A are a two-step process. *See* Iowa Code §§ 600A.1, .8. In the first step, the petitioner seeking termination must first show by clear and convincing evidence a threshold event has occurred that opens the door for potential termination of parental rights. *Id.* § 600A.8. Once that threshold showing has been made, the petitioner next must show by clear and convincing evidence termination of parental rights is in the best interest of the child.

*In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018).

Pursuant to Iowa Code section 600A.2(20), abandonment:

> [M]eans that a parent, putative father, custodian, or guardian rejects the duties imposed by the parent-child relationship, guardianship, or custodianship, which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child.

The subjective intent of a parent "does not preclude a determination that the parent has abandoned the child." Iowa Code § 600A.8(3)(c).

To begin, we agree with the father's assertion that the termination of a parent's rights inflicts a unique deprivation of a constitutionally-protected liberty

interest upon the affected parent. He adds, "The innocent man can be set free. The landowner can be justly compensated. The childless parent has no recourse." Thus, "a parent's interest in the accuracy and justice of the decision to terminate his or her parental status is . . . a commanding one." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982).

Our supreme court has previously recognized that "parents' interest in the care, custody, and control of their children," is "'perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court].'" *Santi v. Santi*, 633 N.W.2d 312, 317 (Iowa 2001) (quoting *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000)). The court has recognized a fundamental right to parent under the Iowa Constitution. *Id.* at 316 (referring to article I, sections 1 and 9 of the Iowa Constitution). "[T]o withstand challenge under our state constitution, the infringement on parental liberty interests implicated by the statute must be 'narrowly tailored to serve a compelling state interest.'" *Id.* at 318 (quoting *State v. Klawonn*, 609 N.W.2d 515, 519 (Iowa 2000)); *see also In re N.N.E.*, 752 N.W.2d 1, 8–9 (Iowa 2008).

On appeal, we must determine whether the actions and inactions of the father since the birth of O.G. satisfy the statutory meaning of abandonment under Iowa Code section 600A.8(3)(b), notwithstanding his fundamental right to parent his daughter. In our careful review of the record, our agreement with the father's argument ends with his proclamation of the importance of the fundamental right to parent. We reject his position that the evidence does not support a finding of abandonment.

Pursuant to Iowa Code section 600A.8(3)(b)(1)–(3), the court may terminate parental rights when:

> The parent has abandoned the child.  For the purposes of this subsection, a parent is deemed to have abandoned a child as follows:
>
> . . . .
>
> b. If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
>
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
>
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
>
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

At the intersection of the father's nearly nonexistent relationship with O.G. is his record of criminal activity and incarceration, his lack of contact with O.G., and his failure to provide support.  There is no dispute that the child is over the age of six months.  The father has not maintained substantial and continuous or repeated contact with O.G. as demonstrated by contribution toward support of the child of a reasonable amount.  He has not visited O.G. at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.  P.G. last saw O.G. in July 2016.  He has paid zero sums toward his court-ordered child support obligation, despite a monthly child support obligation of a nominal amount, and the support paid outside of the court records was minimal.

Additionally, P.G. accepted responsibility for the lack of a relationship. His own actions, or lack thereof, led to periods of his "abandonment" of O.G. within the meaning of subsection (3)(b)(1). P.G. testified:

> Q: Do you accept any responsibility whatsoever for not having communication with M.J. or your daughter from August 2016 until January 2019? A: Yes. I accept all the responsibility.
> Q: So it is your fault. A: It is my fault.
>  . . .
> Q: So you had a choice? A: Yes.
> Q: And you decided not be to be a part of her life? A: Yes.

However, on appeal, he also contends the mother prevented him from maintaining contact with O.G. We disagree.

Our court has affirmed the termination of a father's parental rights in similar circumstances, holding the father abandoned the child—even after making some attempts to contact her—because he did not take steps to assure the mother that he could adequately care for the child, particularly given his criminal history. *See In re G.A.,* 826 N.W.2d 125, 129 (Iowa Ct. App. 2012). Our court concluded the mother did not prevent the father from having contact with the child but, rather, sought reasonable assurances that the child would be safe in his care, which the father did not provide. *Id.* at 129–30. It further held that: "Although we find the mother did not prevent visitation, assuming arguendo that the mother had prevented visitation, section 600A.8(3)(b)(2) requires the father to maintain regular communication with the child or the child's custodian. He did not affirmatively attempt regular communication with the child." *Id.* at 130. Thus, the court concluded the nearly nonexistent contact, combined with a complete lack of financial support, amounted to abandonment, despite the father's attempt to

procure a custody determination from a court shortly before the termination petition was filed.  *Id.*

The record before us demonstrates the mother did not prevent the father from having contact with O.G. within the meaning of section 600A.8(3)(b)(1). O.G.'s mother, following a five-year period of P.G.'s absence, initiated a petition to establish custody and visitation.  The record highlights two occasions when the mother did not allow requested contact between the father and O.G., the first being in August 2016, when the father failed to provide the documentation required in the custody order.[4]  The second denial occurred after the termination petition was filed when the mother did not allow the father to video conference with O.G. after a lengthy period of no contact by the father, with the mother expressing concern for her daughter.

"We do not hold or suggest that termination is a necessary result of conviction of a crime and resulting imprisonment."  *In re M.M.S.*, 502 N.W.2d 4, 8 (Iowa 1993).  However, P.G. "cannot use his incarceration as a justification for his lack of relationship with the child.  This is especially true when the incarceration results from a lifestyle that is chosen in preference to, and at the expense of, a relationship with a child."  *Id.*; *see In re J.S.*, 470 N.W.2d 48, 51 (Iowa Ct. App. 1991) (finding incarceration is no justification for father's failed responsibilities and affirming termination); *In re R.L.F.*, 437 N.W.2d 599, 601–02 (Iowa Ct. App. 1989) (noting a mere generalized interest in child whom prisoner-father has not met cannot bar termination); *In re Griffin,* 210 N.W.2d 665, 667 (Iowa 1973) (discussing

---

[4] Under the stipulation for visitation, P.G. was required to provide proof of good standing with his conditions of parole, including proof of drug testing.

whether the father's pursuit of crime in preference to family life warranted termination, while not deciding whether it amounts to abandonment). P.G. did not pursue a relationship with his daughter even when outside the confines of prison walls.

Because we conclude clear and convincing evidence supports a finding of abandonment under Iowa Code section 600A.8(3), we make no further findings on the second ground relied upon by the district court as "when the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *In re M.M.*, No. 20-0058, 2020 WL 1310254, at *2 (Iowa Ct. App. Mar. 18, 2020).

### IV. Best Interests

The father argues, "In making a determination that termination is in the best interest of the child analysis, a court is not just making a decision about the child." As part of his best interest argument, he also asserts he was "branded . . . as just another irredeemable black drug trafficker who has no care or concern for his responsibilities or future." Bearing in mind the primary consideration is what is in O.G.'s best interest, we provide an edification of the best interest definition related to private terminations.

"The Iowa legislature requires the best interest of the child to 'be the *paramount consideration* in interpreting' the private termination of parental rights." *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020) (citing Iowa Code § 600A.1 (emphasis added)). "The parents' interest must also be given due consideration." *Id.*

For private termination proceedings, the Iowa legislature has defined the concept of "best interest of a child" as follows:

> The best interest of a child requires that each biological parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.

Iowa Code § 600A.1; *see also B.H.A.,* 938 N.W.2d at 232.

"This court has also borrowed from the statutory best-interest framework outlined in Iowa Code chapter 232." *B.H.A.,* 938 N.W.2d at 232 (citing *In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010)). "That framework directs this court to 'give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child[.]'" *Id.* (quoting Iowa Code § 232.116(2)). "Of importance is the child's emotional and psychological health, and the closeness of the parent-child bond." *Id.* (citations omitted).

Finally, we add that our statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child. *In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998) (quoting *In re C.M.W.*, 503 N.W.2d 874, 875 (Iowa Ct. App. 1993)). While our case law illuminates how these many factors may affect the balance in determining the best interest of the child, we have not adopted a formulaic or rule-bound approach. As a result, the case law has limited utility. Each case must be decided on its own facts. *Id.*

As it relates to O.G., the best-interest determination is not a close call. P.G. has been absent the majority of his daughter's life. Even when not incarcerated,

his efforts to establish a relationship with O.G. were negligible. O.G. looks to her stepfather, who desires to adopt, as a parental figure. P.G. has failed to demonstrate a genuine effort to maintain communication with his daughter and has failed to establish and maintain a place of importance in O.G.'s life. P.G. has done little, if anything, to assume the duties encompassed with being a parent.

While P.G., as part of his best-interest argument, asserts the testimony at hearing shows that at a very minimum the mother, stepfather, and P.G. are "equally competent to minister to the needs of the child, which negates termination of P.G.'s rights," the record before us does not support this assertion, and P.G. does not cite to evidence that supports such. Further, P.G. argues that it is not in O.G.'s best interest to terminate his parental rights because of assistance he could provide concerning cultural issues. We recognize and consider this argument as part of "a demonstration of the establishment and maintenance of a place of importance in the child's life." Iowa Code § 600A.1. However, P.G. has not established or demonstrated this place of importance in O.G.'s life. The record is void of any assistance he has offered with cultural issues in the last eight years.

Intertwined in P.G.'s argument is the assertion that his parental rights should not be terminated due to a relationship that O.G. could have with his parents. The paternal grandparents have not seen O.G. since she was very young, despite an acknowledgment by the grandparents that O.G.'s mother extended an open invitation to visit O.G. Additionally, "the law does not authorize derailment of termination proceedings by grandparents, even honorable and heartbroken ones . . . ." *M.M.S.*, 502 N.W.2d at 8.

Lastly, P.G. argues there is not an urgent issue concerning safety or permanency in O.G.'s life, and there is no showing that more harm would come to O.G. if P.G. would retain his rights. We again disagree. Following the last visit of July 2016, O.G. experienced anxiety, disrupted sleep, and attended counseling to deal with abandonment issues.

We acknowledge "there is not always the urgency in chapter 600A termination cases that we have noted in termination cases under the juvenile code (Iowa Code § 232.109 *et seq.*)." *Id.* at 9. We nevertheless think it is well past time to establish a sense of permanency for this eight-year-old girl. *See In re B.L.A.*, 357 N.W.2d 20, 23–24 (Iowa 1984) (noting termination was ordered to allow adoption by a man who assumed the role abandoned by natural father); *see also M.M.S.*, 502 N.W.2d at 9. It is in O.G's best interests to have the parental rights of her father terminated.

## V.     Appointment of Attorney and Guardian Ad Litem

For the first time on appeal, the father argues the district court erred by not appointing an attorney separate from O.G.'s guardian ad litem.[5]

Our error-preservation rules ensure district courts have the opportunity to avoid or correct errors. *See State v. Pickett*, 671 N.W.2d 866, 869 (Iowa 2003) (finding the practice of casting fault on the district court for failing to rule correctly on an issue as "fundamentally unfair" when the party did not give that court an

---

[5] As part of his argument raised regarding the appointment of an attorney separate from a guardian ad litem, P.G. also asserts the child should have been called as a witness by her guardian ad litem and attorney. O.G. was not called as a witness by any party, including P.G. Because this issue was also not preserved, we decline to address such.

opportunity to fix its mistake).  The preservation rules also prevent a party from "remain[ing] silent . . . in the face of error . . . and subsequently assert[ing] error on appeal if the outcome in the trial court is unfavorable."  *Id.* (citation omitted).  P.G. did not raise the same issue below that he advances on appeal.  It is fundamentally unfair to reach an argument advanced on appeal concerning the appointment of an attorney for O.G. separate from her guardian ad litem because it was not properly presented to the district court.  We decline to address this argument.

Accordingly, we affirm the order of the district court terminating the father's parental rights to O.G.

**AFFIRMED.**